Page number 20-750 et al. Stein, Inc. Petitioner vs. National Labor Relations Board. Mr. Piotel for the Petitioner, Stein, Inc. Mr. Fidel for the Petitioner, International Union of Operating Engineers, Local 18. Ms. Tania for the Petitioner, Truck Chauffeurs and Helpers, Local Union No. 100. And Laborers International Union of America, Local No. 534. Ms. Isbell for the Respondent. Morning, Counsel. Morning, Judge. Is it Piotel? Yes, Judge. All right. Good morning, Mr. Piotel. You may proceed when you are ready. May it please the Court. Keith Piotel for the Petitioner, Stein, Inc. When the National Labor Relations Board fulfills its mandate to define appropriate units under the National Labor Relations Act, whether it be in the burn successorship setting or with newly organized units as a result of a successful organizing campaign, it is subject to three congressional requirements. First, under Section 9A of the Act, any appropriate unit must be represented by an exclusive representative. You cannot have a singular employee represented by multiple unions and a single employer. That is not exclusive. Second, under Section 9B of the Act, any appropriate unit must take account and assure employees the fullest freedom in exercising their National Labor Relations Rights Acts. That would include not only those within the unit, but those external to the bargaining unit. And finally, under Section 9C of the Act, history of bargaining cannot be controlled. It can be a factor, but it cannot be controlled. Isn't that history of organization? History of organization, yes, Your Honor. Is that the same as history of bargaining? I believe it is. I don't think there's a differentiation between the two. Has the board treated them as the same? Well, I think this court has treated them as the same, that the history of bargaining, to the extent the court looks like it looks at it in the burn setting, cannot be controlling. And the fried and seafood and the deferred paper cases, those were both histories of bargaining that had long histories of bargaining, as a matter of fact, where the court reversed the board's determination of a unit appropriateness in the burn setting. That may be a fair point. But it isn't quite the same history of organization or extent of organization, which is really designed to deal with the initial representation proceedings. It may be that the viewpoint of you is, Judge, that the petition that was actually presented, the history of that history is not controlling. But if you go and look what the court did in those three cases, tried and seafood and deferred paper, and even in the Indianapolis max sales, which the court adopted. I know it's a Seventh Circuit decision, but the court adopted it in both deferred paper and in tried and seafood, its analysis. It shed a substantial bargaining history where there were job classifications because of the similarity between the excluded employees out of the unit. You may well be right, counsel, but it's not the same thing as extent of organization. So this is a different concept. Yes, Your Honor. Can I ask another question about the statute? So your position, as I understand it, is that there is a a nearly per se rule for plant wide units in an integrated plant. And that is not strong enough even to overcome history to the contrary. But the statute 9B on its face gives the board a range of choices, including plant units, employer units, craft units or subdivisions. Yes, Your Honor. So how do you reconcile your position with that seemingly very broad range of discretion to the board? So actually, it's been conceded, I think, here by the board, and it's free to this court at page 38 of the NLRB's brief. But if you recall what the board does, it doesn't rule. It doesn't issue regulations with respect to the three 9A, 9B, 9C. It rule makes, it does not rule make. It makes its decisions through individual decision making. That's what it chose to do. In border steel rolling mills, the very first sentence of that case, which was a burns case, says there is a presumption of a plant wide unit in a burn successorship setting. Now, in a briefing to the court, the NLRB has tried to turn that on Stein to try to reconcile that with the traditional burns history of bargaining. It said, hey, Mr. Prytel, you can't come forward with the circuit with a case that squares those two principles. I don't think that's our obligation. If the NLRB wants to say that it's holding a burn steel rolling mill where it did have a presumption of a plant wide unit in a fully integrated plant, it's somehow trumped by the history of bargaining. It needs to say that in some kind of decision. Because that's how it issues its regulations, so to speak. Yes. I'm just starting with our precedent in Trident, which held that the plant wide unit test and the community of interest test apply only when delineating units of previously unrepresented employees, and is not as here when the board is assessing historical units that have had long periods of successful collective bargaining. So I thought we were beyond that. We're in a situation in which, as our court and the board have said, the board places a heavy evidentiary burden on a party attempting to show that historical units are no longer appropriate. So in what respect has the board acted contrary to that in determining that Stein didn't bear its heavy evidentiary burden in this case? There's a couple ways, Judge, that we believe the board erred in that regard. First of all, the deferred paper case says you cannot just look at a comparative. What did you do afterwards, Mr. Stein, in terms of trying to change the way you operated and compare it to how it preceded under the predecessor employer here, TMS? The board never undertook that analysis. And this court in both Trident Seafood and deferred paper said, hey, even without a single change in the way you operate, you still can have an inappropriate burned unit when you look at what was done at the predecessor in terms of how it operated, and you only need to move the needle inches, not miles, if in fact that unit was marginally appropriate to begin with. And again, the board did not take that comparative analysis here. It only looked at, hey, you only trained a few employees by the cutoff point that it established for looking at whether there was cross-training and cross-jurisdictional work. Actually, counsel, as I read those opinions, we said you have to look at the prior situation even without regard to any changes, even infinitesimal changes. That's correct, Judge Silverman. You do have to look at that without any changes. Correct. What about the prior situation here was so inappropriate in terms of these are people doing, some are drivers, some are mere laborers, and some are machine operator type employees, and there are different wage rates. So what's the blatant inappropriateness of the prior unit structure? Well, the connection point between all three of those units, and I think it was spelled out in both our reply brief and our principle brief, Judge, was if you take those three labor contracts, the laborers contract, the operators contract, and the Teamsters contract, and you would overlay them with each other. Literally, every wage, hour, and term and condition of employment of those three labor contracts are identical except for the multi-employer fringe benefit funds, the pension fund that they had to contribute to, and the wage rates. And the board itself has said that the wage rates, the mere differential in the wage rates between classifications cannot be the determinative factor in determining whether a burn successorship unit is inappropriate. It said that on the remand of the Indianapolis Max Steel case. But also jobs. The jobs are different, and that's really the driving force. And that's why I understand Stein to have focused its evidentiary proffer on cross-training because, in fact, the jobs are quite different. The jobs are different, and you're correct that from the outset, Stein's announcement was we are not going to operate like TMS operated. These people are going to be cross-trained. There's going to be cross-jurisdictional work. As a matter of fact, in a finding by the board in footnote six of the decision, it specifically rejected the administrative law judge's decision that said, well, Stein, you set this up. You impermissibly changed that cross-jurisdictional assignment, and the board not only reversed the ALJ on that, but said we had a right under Burns to do that. That we had an inalienable right under Burns to do that, and we did that. And so now you get into cross-jurisdictional work where you're having laborers jumping on operating engineers' equipment. They're jumping into Tarek's off-haul trucks, and every unit is doing everybody's different types of work. And that's one of the changes in addition to what was announced in the November 9 communication that the board set the initial terms and conditions of employment, which was the seniority now has been melded together. Excuse me, counsel. With respect to Judge Pillard's question, the fact that jobs are different, is that a ground for separate units? Has the board ever concluded that simply because different jobs are performed by different people that units can be attributed or drawn just in terms of jobs? I don't think it's just in terms of jobs, Judge Silberman. I do think they look at functional integration as well. Right. I don't think I've ever seen a board decision where units are crafted in terms of jobs. The only where it exists, Judge Silberman, is in the construction setting, which are mostly ADAP contracts. That's right. ADAP is a different situation entirely. Yes, but the board does not do that here. It always looks at functional integration, which it did in the Boeing case, which I know is not a Burns case, but it did drive off of the 9A, 9B, 9C analysis. The board says community of interest is not relevant when we're talking about successorship situations. I'm puzzled about that. I can't imagine any other standard that could be used that wouldn't relate to community of interest. Did you run through the factors that you think make separate units here inappropriate? Yes, Your Honor. In addition to the fact they now share exact wages, hours, terms, and conditions of employment as a result of the singular collective bargaining agreement that was implemented 1118, they have common supervision between all employees. They all attend the same safety meetings in the morning. They share the same parking lots. They share the same lunch rooms, same shower facilities. The interaction between the employees is nonstop. This is not something that happens on a sporadic basis. These three units work in conjunction with each other with daily contact, both eyesight contact and verbal contact, trying to carry out the SLAG reclamation that takes place. Perhaps you should go through the functional interrelationship. The functional interrelationship is so interlocking, Judge, that I can't fathom how you cannot find a functional interrelationship between these units. Why don't you just explain it? Sure. The SLAG reclamation has not really changed. There's nothing new here that's changed in the sense that you have terex trucks that are sitting right next to a loader operated by an operator. The terex truck is driven by a tinkster, and there's a laborer hosing down the area to keep it cool so the pits don't catch on fire, the product, and that it's properly loaded into the truck. The laborer also does spotting for safety purposes. He does do spotting for safety purposes, and that is another factor where the board has been kind of inconsistent here because it says if someone's function is safety and it's inextricably intertwined with the bargaining unit, Westinghouse decision, then they belong in the same unit. I see I'm into my rebuttal time, and I do want to get to Mr. Curley in my rebuttal because I do want to raise some points there. Why don't you say a little about Curley now so that other council have a chance to respond to what you say. Unlike many courts, we're a little bit loose with our time. We really want to get your assistance in deciding cases and deciding it appropriately. If my colleagues are not bothered by that, I'll give you a chance to address Mr. Curley's situation. Thank you. Before we move to a different topic, can I just ask one more question on this, which seems to me your best case is Indianapolis-MAC. Yes, it's a very strong case for us. It would seem to be distinguishable to the extent that the smaller units of the parts unit and the service unit in that case were historically represented by the same union, which supported a finding that the collective bargaining had effectively been merged and historically done together. We don't have that here with historically three separate units. You're correct, but they were two different units. I understand represented by the same union, but there were two separate units in Indianapolis-MAC cells. You're correct, Your Honor. Sure, but the fact of having only one union in Indianapolis-MAC would seem to make it easier to think that historically the collective bargaining had been done together. Except Border Steel kind of runs counter to that, because there you did have multiple unions in a burn successorship setting, where it was the steel workers battling it out with the Teamsters when the amalgamation took place. That was the case you mentioned earlier on planned by presumption for burns. Yes, Your Honor. Okay, thank you. You can move on. Briefly about Carely, there has been a marked shift in the board's theory when it reversed the judge who originally decided to Carely on the proposition that we had impermissibly changed the 60-day laborers probationary period to a 90 working day probationary period and therefore violated the act. The board went all together a different theory and said, no, no, no. He had the right to do that under burns. We have the inalienable right to change the probationary period under burns. There was never a question that Carely was in his probationary period. He admitted it. The board argued it and the board argued he was in a probationary period because they wanted to fit this case into their total security management proposition, which is in between labor contracts when employees are unprotected as the negotiation process is taking place. The total security case held in that setting, you had to go to the union first before issuing discipline because those employees were unprotected. They wanted to stretch that in our case to the probationary period of a contract where they similarly are largely unprotected. So there wasn't any question by the parties here that we were dealing with a very valid, legitimate probationary period. Matter of fact, that's what the board argued in its briefing to the ALJ. Then it comes to the board and the board said, no, wait a minute. He wasn't in his probationary period because the 90 day, which doesn't say calendar or working day announcement in the November 9 announcement, was our initial terms and conditions that somehow changed when we did it 90 working days. The key there, I think, to the whole key thing here, Judge Pillar, to this is that look at how they pled their case in paragraphs 11 and 12 of the complaint. They actually said that the labor contract with the operating engineers was in fact our initial hours, wages, terms, and conditions that we had a right to establish under Burns. In that labor contract, as clear as bells, it says the 90 day working period is a working period. It's not a 90 day calendar period. So when I'm defending that case down below on that theory, I'm just simply going in there kind of like with Burns in my back pocket. I just have to show that Burns says I get the right to set that. Now they tilted it and changed the theory altogether to this 90 calendar day versus 90 working day, which was never an issue in the case. All right. I think we have a sense of your position. Thank you, Judge. Some time for rebuttal. Thank you. Can I just ask one quick question? If you were to prevail on your basic position, does the Carly issue drop out? The basic position of the units, Your Honor? Yes. If you were right, that the separate units was inappropriate, then the Carly issue drops out, isn't that right? Because we have the unified collective bargaining agreement. That's a very clear text, Judge. Yes. Yes. Mr. Fottle. Yes, Your Honor. Timothy Fidel on behalf. All right. Fidel. Your Honor. Participant responded. International Union of Operating Engineers. With the court's leave, I would request a two minutes for rebuttal time. Mr. Fottle, you néné BW says she would be gluelinous with the names of various actors involved.   Thank you. You follow?  Ms.  Yes, Your Honor. I accept the briefness and allegiance to highlight the asking directly. It has always been a fundamental precondition to any finding of successorship liability that there is an actual collective bargaining agreement in existence between the predecessor employer and the union. And that that prior agreement was the product of majority support. Mr. Fidel, your hurdle here is the time bar. And I'm just wondering, how do you distinguish southern power? I weather where we applied Section 10 B time bar to burn successors, nine a majority status defenses. The best distinction that the union would point to in this case, Your Honor, is that here the union is alleging or asserting the lack of a nine a status in response to the board's inclusion of that status as an element of its case. In this case, the board itself identified Section nine a status as an element of its claim. Well, whether they say it or not, it's implicit. You have a, you know, the notion under Burns is you have a union that has been recognized historically. And that is a presumptive appropriate unit when a new employer takes over. And the fact that they pleaded in here is just a recognition that that's one of the preconditions. And factually, maybe they're wrong. But that doesn't that doesn't lift the time bar. Or at least I'm not following your argument about why it might. Well, in the case where the employer is required to excuse me, where a union is asserting a successorship obligation on behalf of the successor employer, that that entire relationship is based upon a underlying nine a representational relationship. Right. That's usually presumed. There's usually no doubt about that. It is usually referred to by reference to board certified elections or appropriate language in a collective bargaining agreement. In this case, you don't even have a valid collective bargaining agreement that the that the teamsters or the laborers could cite to when they're attempting to assert a successor obligation. In both cases, in both instances, the collective bargaining agreements between the predecessor employee TMS and the laborers and the teamsters were both expired. I believe for the laborers, it expired sometime in 2016. And for the teamsters, it expired on December 31st, 2017, which is immediately prior to the successor employer taking over. During that period of time, there were no requests for bargaining. So to the extent that the Southern Power cases and that line of cases all point to the existence of a collective bargaining agreement as a basis for finding a nine a relationship, it was the existence of a valid collective bargaining agreement that was being maintained by the employer. In this case, we really do not have any evidence of the collective bargaining agreement being maintained. Well, counsel, that puzzles me because even without a collective bargaining agreement and there is a collective bargaining relationship with the incumbent union. Isn't that correct? Otherwise, under your theory, there wouldn't be any collective bargaining obligation on part of an employer when there was a gap between one contract and another. And we know that's not true. There is a reasonable period of time where collective collective bargaining where the Actually, it could go on for three years of negotiation. There's still be a collective bargaining relation. Correct. Based on the individual facts and circumstances, it could take up to three years, Your Honor, if the parties were engaged in actually good faith negotiations towards reaching a successor agreement. Unless you could argue the union was defunct, there would still be, which is a very limited concept, as you well know. There's still be a collective bargaining relationship. So I don't understand your emphasis on an existence of a collective bargaining agreement or not. The union's emphasis would be on the fact that neither the laborers and the teamsters have ever introduced any evidence that would show that they had a majority support within the unions, within the units that they pretend to represent, Your Honor. And that would be the point that Local 18 is the only labor organization that was able to make any showing of majority support in any unit, both the unit prior to the merger and the unit after the merger. Well, I don't think, did Stein challenge the majority status of the teamsters and laborers, assuming they were legitimate separate units? I believe the evidence in this case, the record demonstrates that on November 9th, Stein's employees, including union stewards, that it would no longer be recognizing laborers or teamsters. But that's because of the unit determination, not because of a claim that the teamsters and laborers no longer represent the majority. I think this is a diversion from the main issue in the case. Very well, Your Honor. I see I'm beyond the time that has been allocated. All right. Thank you. Judge Cassis, any further questions for Ms. Fidel? We'll hear from Ms. Spanja? Spanja? Spanja? Ms. Spanja, Your Honor. Thank you. Say it again? Spanja. Spanja. Okay, thank you. I may proceed. Thank you. Good morning. May it please the Court, I'm Stephanie Spanja, and I'm here on behalf of the Joint Petitioners Teamsters Local 100 and Laborers Local 534. I'm sorry, Ms. Spanja. Your voice is actually fluctuating quite a bit. Okay. I don't know if it's moving your head or if there's a way to hear you clearly or not so clearly. Okay. Well, I'll do my best to keep my head and keep the movement to a minimum. The Joint Petitioners have petitioned this Court for review of only those portions of the Board's decision in which the Board deleted the ALJ's ninth conclusion of law that Stein had forfeited its right as a Byrne successor to set the initial terms and conditions for the bargaining unit employees that were represented by the Teamsters and Laborers, and also that I'm having terrible trouble hearing counsel too. It goes up and down and up and down. Is there something wrong? Is there something wrong with her microphone? I think it is a microphone issue. Can you bring it closer or hold it up? Actually, I'm just speaking into the computer. Is that better? That's better. I feel like a giant head right now. I know you'll end up with a backache, but it will actually help us a lot to hear you. It's more important that you hear me than just ignore the giant head here. So, as I was saying, the Petitioners have petitioned for review of the Board's deletion of Judge Collins' ninth conclusion of law in which he had found that Stein had forfeited its right as a Byrne successor to set the initial terms and conditions of employment for the employees represented by Teamsters and Laborers, and also that portion in which the Board deleted the part of Judge Collins' order directing Stein to retroactively restore the terms and conditions of employment for the Teamster-represented drivers and Laborers-represented laborers under their respective contracts. The Joint Petitioners respectfully submit that in these respects, the Board's decision was arbitrary and clearly erroneous, and specifically, the Board misconstrued key aspects of the Judge's factual findings and misapplied its own precedent in advanced stretch forming. Accordingly, the Joint Petitioners respect the request of the Court, reverse those portions of the Board's decision, and restore the ninth conclusion of law as well as the portion of the remedy that was also stricken. In Byrnes itself, the employer spent a month hiring its predecessor's employees and encouraging them to fill out union cards for its preferred union before it began operations and proposed its initial terms, but the Supreme Court still held that Byrnes had a right to impose those terms, and so I'm just wondering how is Stein's conduct here distinguishable from the conduct that the Court held did not require, did not forfeit the right to set initial terms and conditions in the Byrnes case itself? Yes, I think that Stein's conduct is distinguishable in a couple of different ways. One is that in this case, Byrnes had already had an active relationship with another union at a different site, and here the Board has found that Stein did not have any other relationships with, pre-existing relationships with the units that were on this site. In addition, Stein's course of conduct throughout... Why is that point relevant? Well, it's relevant because you basically have at least a fig leaf of an employer attempting to maintain an ongoing relationship with one union. Here, Stein essentially barged in and disrupted the ongoing bargaining relationships of two unions, and it did so in a very clandestine and secretive manner. It solicited one union months before it even had won the contract for AK Steel, and then secretively engaged in collective bargaining negotiations without even having had a show of majority support among other unions. Hasn't the Board made a policy decision, legal policy decision, as to what kind of matters will cause a forfeiture and what will not? And aren't you swimming uphill? The Board, in its response to us at Swarbrick, articulated essentially two rules. One would be a situation which, in the Love's Barbecue line of cases, where an employer goes out of its way to avoid hiring discriminates against the previously united employees. And then the other case in which they simply refuse to have a union at all. They simply have to utter the words, no union. And we think that advanced stretch forming goes a bit beyond that and articulates a broader equitable principle at play here. Because the issue here is that this involves a blatant coercion, to paraphrase stretch forming, of the employees of their right to bargain effectively through representatives of their own choosing. And here, the teamsters' employees and the laborers' employees are both denied the ability to be represented by their representatives of their own choosing. If Stein and the operating engineers are correct about the unit question, then your claim falls away, right? I guess I would have to consider that, Your Honor. Honestly, I'm not sure, Your Honor. I think I've encroached upon my, Your Honor, I'm sorry. I've encroached upon my response time, my rebuttal time, so I should close. All right. We will hear now from the board. Ms. Isbell? Thank you. Good morning. Kelly Isbell here on behalf of the National Labor Relations Board. Stein presented its employees with a fait accompli. It would bargain with Local 18 and only with Local 18. Choosing the union for your employees and imposing it on them is a violation of national law. Wait a minute, counsel. The whole question is what is the proper unit determination, isn't it? It is. Why don't we go right to that rather than waving the bloody shirt? If you insist, Your Honor. What Stein's defense is that the historical units are no longer appropriate. I don't read their brief or their arguments to the board as arguing that the existing units before they took over were inappropriate. This is an issue. I do. They cite our cases. Trident and Deferius. And both of those cases focused heavily on the question of whether or not the existing units were appropriate without regard to any changes. Yes, those two cases did. But I don't see an argument that these particular units were inappropriate beforehand. I do saw that in their brief. They focus on the interrelationship of the employees, which is a question preceding their Stein taking over. When there is a successorship situation, the board does not conduct an analysis as if it were in an initial bargaining situation. Yes, you said in your brief you do not use community of interest. You no longer use that in a successorship concept, right? I don't know that the board ever used the entire community of interest analysis as it would in an initial 98. Okay. Now, that fascinates me. As we have said, in our opinion, if it fails to conform reasonably to other standards of appropriateness, the existing situation, then it's not an appropriate unit. Right? Exactly. Now, explain to me how that standard differs from community of interest, because I find it very difficult to even conceptualize a standard that would be removed from community of interest. It is not entirely removed from community of interest. You are correct. Then what is it? You say counsel didn't establish his burden, but I had a damn good time trying to figure out what standard he has to prove to. He has to show that the units are repugnant to the Act's policy. What does that mean? Or truly inappropriate. Now, why aren't these units truly inappropriate? Do you have any example of any case anywhere by the NLRB in which a unit like this was declared appropriate? Your Honor, are we in a successorship situation? No, no. You said the question in successorship is whether it's truly inappropriate. I can see there may be some flexibility along the edges, but this case looks to me like it would be truly inappropriate if it came up ab initio. Would you agree with that? No regional director would ever allow this unit to be put together in three different parts. Don't you agree? I'm not entirely sure I agree, but remember in a successorship situation, in any initial bargaining situation even, you're looking for an appropriate unit, not the most appropriate unit. Well, that's absolutely correct. But I put it to you. Give me a case where this kind of situation was thought of as an appropriate bargaining unit. Any case anywhere. I'm going to have to think about that, Your Honor, because there are a lot of cases rolling around in my head. I'm thinking about it a lot, too. And I would put it to you, there is no such case. Well, even if we go back to hotel cases, for example, those employees are also doing functionally integrated work. Everyone is running the hotel, making sure guests have a good time. And the board has found those units can, in many cases, be separate units. What kind of units? Is it like people who are doing luggage transport versus people who are cleaning rooms versus what? The front desk, the people who are running the restaurant. They all have to make sure their jobs are coordinated. Traditionally, clerical employees can be disassociated from production and maintenance employees. That's true. But I can't imagine a circumstance, and I know of none, where this would be deemed an appropriate unit, what we have here. You have functional interrelationship between all of the three groups. They all work together. They all eat together. They all go to briefings together. It's hard for me to imagine a case in which separate units would be thought of as inappropriate. I agree you have a little flexibility, but you have to show an appropriate unit, don't you? Yes, Your Honor. Go ahead. This court, the board with this court's approval, and Trident, the Theriot, Southern Power, gives significant weight to bargaining history. These three units have existed for at least 40 years, and these employees do completely different work. Forgive me for interrupting you again. Would you agree that if the board relied only on bargaining history, that would be a blatant error? When I read Southern Power, the court's decision there seemed to turn entirely on bargaining history. Well, and isn't that really a burden question in disguise, in the sense that the burden is on the party attempting to show that the historical units are no longer appropriate? And we've deemed it a heavy evidentiary burden. I guess it's really a question of not ab initio, is it appropriate, but has Stein borne its burden? But let me get at this a little bit. I have some of the shared concerns as Judge Silverman. What would be the affirmative rationale? It's just a little hard for those of us who aren't closer to this kind of scenario. What would be the benefit to the Teamsters to having different representation and to the laborers having different representation, given that so many terms are similar? The terms are similar. But remember, in a successorship situation, we are allowing the employees to continue their choice of representative. Stein has imposed a representative on them, and these employees have chosen to be represented by the Teamsters or the laborers for years. Right, which is sort of the, that's the historical factor. But just thinking a little, and I recognize that that, I mean, as I read the cases and the board cases, our cases and the board cases, it has a presumptive strong weight, what the history has been. And there's a kind of past dependence, but I'm asking you to bracket that, recognizing that it's quite important to the board's position to bracket that and say, well, what are the other functional reasons? And I understand that because the pension rights are one of the things that are at issue here. What I'm referring to as past dependence is actually very important, because someone shifting pension plans is detrimental to employees. Other than these sort of what I'm calling past dependent aspects, why would a group of Teamsters want a different unit from a group of engineers on a work site? Well, Your Honor, I think you can just look at the collective bargaining agreements themselves. I know Mr. Pryotel has represented that the collective bargaining agreements are basically the same, but they're not. There are different probationary periods. The Teamsters and laborers had different probationary periods. How different? One was 30 days, one was 60 days. The laborers and the Teamsters had shift differentials, but Local 18 does not have a shift differential. Local 18 included premium pay for two different kinds of operators. I can't remember one of either the Teamsters and laborers also had premium pay for lead men. Teamsters are guaranteed. But all that just goes to bargaining history. That doesn't go to the question of whether it's an appropriate unit or not, does it? But it goes to Judge Pillard's question about why. That's a fair point. It does answer Judge Pillard's question. What I'm pointing out, that's just part of bargaining history. That isn't a question relevant to whether it's appropriate. One unit is appropriate. Doesn't it? I mean, you're talking about what are the kinds of things that they're interested in negotiating for? And if they come out differently, maybe they're different priorities. Is that the more general point? That is the more general point. Yes, Your Honor. I don't think that's relevant to appropriate units. You have to assume here that there's some reason why the Teamsters and laborers unions want separate representation. You don't know whether all the employees want separate representation. They may think there's a benefit to being represented by the operating engineers who typically get greater pay. So we don't know that. We don't know what the individual Teamster employees and the individual labor employees labor want. We don't know what we know what the unions want. Right. Well, Your Honor, let me say that there were union security clauses in these contracts. And as far as I can tell, that means that 100 percent of the employees had signed cards with the Teamsters or with the laborers. Well, of course. Of course, you don't have a separate secret ballot election. So you have no idea what the employees real views would be with respect to whether they want representation by the operating engineers or Teamsters. We also know that under the operators, the new contract with Stein. These employees do not make the exact same wage. There are still distinctions based on who's a driver, who's a laborer and who's an operator. Yes, but we don't the board doesn't in determining what's an appropriate unit doesn't look simply at rate wage rates. They don't think wage rates are relevant at all on that question. No, but I'm specifically answering your point about why. You're asking Judge Pillard's question. Why? Here's why, Ms. Isabel, why it isn't relevant to what I took to be the underlying issue, which is community of interest of the unit. Is it an appropriate unit? One of the aspects of community of interest or am I missing something? So far, no, Your Honor. One of the aspects is community of interest. And one of the artifacts or one sort of indicium of a community of interest would be if you end up with a collective bargaining agreement that that has different kinds of terms. It might reflect the fact that those workers interests are in are different from another worker's interest. And they result in different terms. Their interest is in getting into a secure job more quickly. Maybe they have more competitive power in the market, so they have a shorter probationary period. Their interest is in a higher wage. There's a finite pool from the employer. They want a union devoted to getting them a bigger piece of that pie. And that would be their common interest and their interest in contradistinction to someone else. Or am I conflating issues unwittingly here? May I add one point here? I wouldn't mind hearing from Ms. Isabel. Okay. Okay. Go ahead. Let her respond, and then I'll say something about community of interest. The problem is the premise of your question is problematic because the board has specifically argued in this case the community of interest. Is it not relevant? Which has absolutely stunned me. It is not completely irrelevant. You are correct, Judge Silberman. Yet you've argued in your brief that it is not a factor you look at in successes. The board does not conduct an initial community of interest test as if it were the initial 9A bargaining situation. Your brief actually said community of interest is out. If Stein cannot prove that the historical unit is truly inappropriate and that is their burden. Excuse me, Judge Pillard. The only reason I interjected is because they specifically made the argument that community of interest is irrelevant when we're talking about successorship. I take it that your position, Ms. Isabel, is that the board is not required to conduct the same community of interest analysis it would if it were determining for the first time whether a unit is appropriate. Yes. I'm just reading from your heading in your brief, which is B4. So that's the subordinate position in which you think we should be considering community of interest here. Actually, I thought you made a statement. The fact that it was out, community of interest, was actually out. I remember that in your brief. But in any event, what I would love to know is if community interest is out, what's in? You say the petitioner didn't prove the case. What I'm trying to figure out, prove to what standard? We said in our case, does the unit conform reasonably well to other standards of appropriateness? That's what we thought the law was. That means you have to look at what your normal standards are, which are community of interest. I can't imagine any other standard but community of interest. What could it be? In this case, the board determined that these units were appropriate. These employees have... In accordance with what standard? Remember, we're not looking at every single community of interest factor the board might look at. But the board referred to the job function, the separate bargaining history for at least four years, their separate identities. You're back to bargaining history. You would admit you cannot rely on bargaining history alone. If you do that, you're in error, right? It cannot be relied on alone. You're just describing things that all translate into bargaining history. Your Honor, I guess I disagree. Seriously, I'm not trying to crosstalk. I know to some extent Judge Silverman and I are seeming to directly be in conversation with one another. I thought job functions were separate from bargaining history. That was the first thing you mentioned. I thought that was a pretty significant aspect of the inquiry. Am I wrong? I don't think you're wrong at all, Your Honor. These jobs are very different. They remain very different after Stein took over. You're talking about jobs or job functions? Are you talking about... Job functions, the work. The work that people are doing. The actual work they're doing? Yes. Doesn't the Board resist any units focused only on job duties? I thought over and over again the Board rejected that notion. Your Honor, the Board rejects the notion of having a unit that is completely defined by job classification. Right. If you look at Trident, those employees were doing exactly the same work. The only thing that differentiated them was where they were hired. That won't fly. But if the employees are doing completely different things, which these employees are... Different things or different... Isn't the question always whether they're interrelated? In other words, in a typical production and maintenance unit or a production unit, you can have people performing every job under the world. But if they're interrelated, functionally interrelated, they're always treated as a single unit. Not always, Your Honor. I mean, functional integration does receive weight from the Board in initial bargaining situations. And it's time... Well, what do you look at in a situation which is not an issue? I think there's a big, big, big gap in the Board's position. I think you're relying on only bargaining history. Because everything else you focus on, different job duties, is irrelevant in the typical bargaining unit determination. I'm sorry. I disagree. Job duties and what employees are actually doing day-to-day? Yes, Your Honor, what they're doing. The question is whether they're interrelated. Isn't that the issue? That is not the final question for the Board here. I know it's not here, but it is typically. In an initial 9A situation, not in a successorship situation, Your Honor. What is the standard in a successorship? This is what we said. We said reasonably well connected to other standards of appropriateness. So you look at your other standards of appropriateness. And I put it to you, if this case came up in an initial situation, a regional director would laugh out loud at the notion that there would be three separate units. Isn't that correct? I am not entirely sure. I know that if a union came in and petitioned for one plant-wide unit, that would likely be approved. But this is not a situation where one union is petitioning for a plant-wide unit. This is a situation where these employees have had three unions for more than 40 years. That's the bargaining history. What other standard do you have? What they actually do. I don't know. Their pensions and benefits. I see I'm starting to go over my time. That's all right. In terms of the pension, we don't get there if we don't find this to be an issue. I'm going to go back to the question of, you know, governed by Byrne's obligation to bargain with the free unions. But I was a little, it was just hard for me to envision concretely what the implications are for workers who have been under one. Collective bargaining agreement and one pension plan, and then are shifted to maybe an equally good one. But it's a different one. How is it that there. How does it work? If there's been a period of time that they've accrued rights and, you know, some of the. Apparently some of the teamsters and labor say disadvantages them, even though they have presumptively an equally good pension plan, they have a different one. Can you just explain that a little bit in concrete terms? Unfortunately, I can't. In terms of exactly what will happen. I don't know. I know this is unfortunate for the employees, but I also know that Stein could have. Decided they would all be in private pension plans or have no pension plan whatsoever. As long as it announced before. Making the offers to hire. It could do that. Under the determination that they. Had not forfeited their right to set initial terms and conditions. Right. Your honor. Yeah. So, so that's sort of. I don't know. Neither here nor there on this question of unit appropriateness. Can I ask you about the jobs? So. It strikes me that here. The. Different units involve people who are doing. And. Fairly similar jobs. Point one and point two, though, the work is highly integrated. And we've talked about integration and on. Similarity of the jobs you have in one unit. People who are driving. You have people who are driving. Fuel trucks in another unit. You have people who are driving. Dump trucks and water trucks. Doesn't strike me as. Completely apples and oranges. And in that respect. This case seems a lot like. Indianapolis Mac, you have. You have the. The parts people and the service people and. They work. Hand in glove together and the jobs aren't completely different. You have some degree of crossover. And. That's the situation in which the board said. And. Not withstanding the history of separate units. Even in a burn situation, this just, this has to be one plant wide unit. Consistent with. A lot of things you've said in the non burns context about plant wide units. In Indianapolis Mac. I think you're right. Those units were bargained. And. Parts and service. Together before the successor came in. That's the one fact that. Sort of helps distinguish maybe, but there are a lot of similarities between Indianapolis Mac and this. Case. In Indianapolis Mac, those employees were doing each other's work. So the, and, and it was, it was a parts and service case. So the board has traditionally put parts and service. Employees together. It just traditionally does. But they were true, but you've also traditionally said. Plant wide units are favored. Right. So we have the same. The same difficulty, which is on the one hand, you have. Default rule. For a broader unit. And then on the other hand, you have a strong preference for following history and we just have to balance those. And in Indianapolis Mac, those employees were doing each other's jobs. The parts people sometimes did mechanic work. The mechanic sometimes did the parts work. Here before Stein took over. There was no interrelationship between the job. Only the teamsters drug, the dump trucks. Only the laborers did the laborers work. After Stein took over. I'm sorry. I didn't hear you. Well. Except that at page 31 of your brief, you say that the cross training and cross jurisdictional work. That happened after succession. Was not as novel as Stein suggests. And you go on for. The rest of the page about some degree of blurring of functions, you can see that there was not a lot of communication. I think it was even pre succession. Right? Because sometimes TMS needed other drivers when there weren't enough. Teamsters, but on a regular basis. Other people weren't driving the teamsters trucks. So here. You've got much more distinct and separate job functions before Stein took over. After Stein took over. They did some cross training. But remember by three months after they took over, they had only cross trained six of 60. Of their employees and their own manager said, even those employees were still doing primarily their traditional work. So the laborers were still doing primarily their laborers work. Well, of course, but that's the advantage of cost training. You get much greater efficiencies. Which may be one of the reasons why Stein was able to underbid others to get the job, because he thought he saw the efficiencies. It could be. In fact, there was testimony of that effect to that effect. He saw the efficiencies could be gained by interrelations and cross training. I mean, if you could drive a. If you could drive one of the sophisticated. Piece of machinery, you could drive a truck. Or vice versa. They could teach back and forth and the laborers could be taught to do some of the more sophisticated work too. And I will point out that this is one of the examples that go to why these employees have different bargaining interests. The laborers who are now operating. The big pieces of machinery that was formerly operators work are still making laborers wages. An operator makes. Well, that goes to. The new negotiations on the part of the operating engineers. You see what would happen in the next collective bargaining agreement. My experience would tell me that the operating engineers would bargain to get the wage rates up for both teamsters and laborers. Because they're the highest paid. I have no indication that that will be true. You don't know. You don't know. Of course, that's speculation. But if we conclude that the board did not examine the existing situation, look only to the changes that would be under our law a demonstrable error, wouldn't it? If you were to find that, then I think you should remand for the board to make that determination. But I think if you look at page 29 of the joint appendix, which is a page of the ALJ decision, the ALJ did consider whether or not those units were before the changeover were appropriate and found them to reasonably comport with. Conclusion, just a couple of sentences, right? I'm sorry, what page? I thought the ALJ analysis was purely comparative. The boards is arguably not, boards is very cryptic and arguably not, but I thought the ALJs was just purely comparative. I think if you, if you look at the board's footnote where it says basically the work classifications and then read joint appendix 29, the ALJ fills in with a little bit about duties and the separate identities. Okay, I'll take a look. I think in a successorship situation is all he had to do. I mean, in a sense, this is, I was, you know, applying a lot of the law thinking about this with a lot of the law about, about deference and the burden, but in Cadillac asphalt, for example, the board finds that the Teamsters unit is, you know, they're under, under similar supervision, there's a lot of similarities, but they end up looking at how the mere change in ownership shouldn't uproot bargaining units that have enjoyed a history of collective bargaining. And, and I mean, the factors here just don't seem that different. I would agree. All right. Further questions for Ms. Isbell? Oh, thank you. One second. No, I think I'm good. Thank you. All right. So we'll, we told the petitioners that we would give them some limited amount of time for rebuttal. So we'll have first from Mr. Prozell. Thank you. Cadillac asphalt was a perfectly clear successor case, totally different scenario from the outset. They, they absorbed what existed pre preceding it. Judge Silverman, you asked on the diversion question. I know it's a diversion question, but did Stein challenge the predecessor units right out of the gate? We did. I had conversations with the, I was the person who had the conversations with the lawyers for the laborers and the teamsters and said, give me cards, give me something that show you had majority support. Not only that, at the hearing, we issued subpoenas to them, which the judge allowed initially saying, yeah, that's an issue here. That's in play here. And nothing was produced in terms of any cards, any certification by the board, anything to show that they had any majority interest at any point in time. We got nothing from the subpoenas. Judge Pollard, you asked about, you know, the benefits, which I understand would be a concern to an employee, but at page 12 of our reply brief, there's a, a case, pretty much dead on point AC pavement striping by the board where it said that the fact that the employees received fringe benefits based on their union affiliation, rather than on their assessment of their skill or aptitude is not a community of interest factor that needs to be considered. And finally my colleague mentioned as an example, the hotels, I don't have my brief to the administrative law judge, but I could tell you, it was much, much, much longer than the brief I was allowed to file here. And in it is a case on a hotel from the advice section of the NLRB that squarely held that, you know, the differentiations between what used to be a combined unit. And then it was taken over at the Aladdin hotel in Vegas, where you had a front office, people, culinaries, maids, and the way the employer had configured that into being under one kind of like central management was enough to defeat the predecessor's history of a, of a separate bargaining units between those different units. I can't remember the name of the case. I don't have it with me now, but it is in my brief to the administrative law. Gene Genji corporation. Yes. Yes. Corporation. Yes. Yes. And finally, just on the functional, I know everybody's all the board is particularly hung up on it. Well, how much do you really get into the training? Understand that they only took a snapshot for a very limited period of time in both bands and contracting, which was not a burns case. I'll concede that it was an eight F to a nine a case, but the theory of paper was a, a, a, a burns case. The only thing that happened there is the employer announced in a handbook and said, we are going to stop this segregation, siloing of work and we're going to have efficient, functionally integrated workforce. They announced it in a handbook without even implementing it. And that was a consideration by this court and saying, we questioned whether these units were appropriate. I think that the panel for its time, if there's any other questions, we have a happy to answer them. Other Russians. All right. And we'll go to Fidel. No, have I mispronounced it again? That is fine. Not to belabor the point, but just to piggyback on, on this surprise, no discussion regarding the post-merger training to point out the limited period of time that we were allowed to introduce the evidence regarding that post-merger training to be clear, the concept of instantaneously cross-training a teamster to perform operators work or labor to perform teamsters work is not possible by virtue of the nature of the jobs being performed, the skills that are necessary to each job. It takes an incredible amount of time, more so than three months to fully fully train and cross-train each employee and the performance of its co-employees duty. This is especially true when you're talking about the operation of heavy equipment in the context of a slide reclamation project. In those circumstances, it would not be uncommon to take months or even a year for an employee to become fully versed in the ability to operate the equipment necessary to perform job duties inherent to an operator's position. Same. So for an operator who spent his entire time inside the cab of a piece of equipment to be able to learn the job duties of a labor or a teamster, it takes a significant period of time. Counsel, what did you think of the lawyer's argument that you could have a separate unit based on job titles? I don't believe she said that. I believe she said based on job functions, excuse me, job titles or functions, either one. It has been our experience that the only field where you will see a collective bargaining agreements and determined by job titles and functions are in the construction industry, where there are the specific jobs and specific duties attached to each member of a specific craft. Under ADAPT. Correct. Which we believe may have been the underlying collective bargaining arrangement that gave rise to the collective bargaining agreements between all three employees. I apologize for equating the job titles and job functions but I think of the concepts as quite similar. But we don't look to individual functions in developing a bargaining unit. As I understand, the board never does. They look at the interrelationship because in a typical factory, you might have 20 different jobs or in a particular site, you might have 20 different jobs. The question is, for the board, how do they interrelate? Isn't that correct? Yes, Your Honor. I think it's a question of all butchering the same office. To the extent that they're all employees all working on butchering the same office, one may start at the head and one may start at the tail. One may use a big knife, one may use a small knife, but still function the integrator. You're saying it's completely irrelevant to a unit assessment, the degree to which the different jobs are similar or not in what they actually do? I'm not saying it's completely irrelevant. It's just not determinative. Okay. I thought that was a good fact for you and that when you start arguing that it takes months and months and months to train one kind of worker to do the job of the other, that actually you're arguing against yourself on that point. Well, Your Honor, I believe the point making that is, is that for the employer to actually take the time in the middle of trying to operate its business and continue its business operations of keeping up with the steel mill's production of swag, processing that swag, and then in order for a new employer to cross-train its employees while still doing that, it does not happen overnight. And it was inappropriate for the ALJ and for the board to limit the evidence of that cross-training to a 90-day period. I gather your argument is the relevant question is what your plan is, not how far you have effectuated it in three months. I believe it is. What evidence do you have of effectuating the plan that you have in place? Yes, Your Honor. It would be considered what is your stated plan and what steps have you taken to complete that stated plan? Right. Ms. Spagna, it sounds like it would be helpful for us, if you have anything to say about it, if you would focus on the question of unit appropriateness and whether Stein has met its burden here, or maybe you don't have a dog in that fight. Well, we actually filed a petition for review on only two narrow points regarding the board's order. Right. But you would be supportive. Right. So at this point, given that the discussion up to this point is not, the board did not focus on the areas that we had filed our petition for review on, we're content to rest at this point. Thank you for your time. Great. Thank you. Thank you all very much for a very instructive argument. The case is submitted.
judges: Pillard, Katsas, Silberman